## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CYNTHIA A. WAMPLER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00023 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Cynthia A. Wampler, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wampler protectively filed her applications for DIB and SSI on January 10, 2006, alleging disability as of January 1, 2004, due to "nerves," anxiety, panic attacks and depression. (Record, ("R."), at 58, 59-61, 92, 456-63.) The claims were denied initially and upon reconsideration. (R. at 36-38, 42, 47-49, 466-68.) Wampler then requested a hearing before an administrative law judge, ("ALJ"). (R. at 50.) The ALJ held a hearing on March 9, 2007, at which Wampler was represented by counsel. (R. at 488-531.)

By decision dated March 23, 2007, the ALJ denied Wampler's claims. (R. at 15-26.) The ALJ found that Wampler met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2007. (R. at 17.) The ALJ also found that Wampler had not engaged in substantial gainful activity since January 1, 2004, the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Wampler suffered from severe impairments, namely low back pain, fibromyalgia, major depressive disorder and anxiety, but she found that Wampler did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20-21.) The ALJ found that Wampler had the residual functional capacity to perform

simple, noncomplex, light work,[1] which required little contact with co-workers and occasional interaction with supervisors. (R. at 21.) Thus, the ALJ found that Wampler was unable to perform any of her past relevant work. (R. at 24.) Based on Wampler's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Wampler could perform, including those of a laundry worker, a garment folder, a janitor and a vehicle equipment cleaner. (R. at 24-25.) Thus, the ALJ found that Wampler was not under a disability as defined under the Act and was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued her decision, Wampler pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 5-8.) Wampler then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Wampler's motion for summary judgment filed October 8, 2009, and the Commissioner's motion for summary judgment filed December 9, 2009.

## II. Facts

Wampler was born in 1976, (R. at 59, 456), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Wampler has a high school education. (R. at 96, 501.) Wampler has past relevant work as a florist, a waitress, a

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

dishwasher and a cashier. (R. at 73, 93.)

James Williams, a vocational expert, also was present and testified at Wampler's hearing. (R. at 525-30.) Williams classified Wampler's past work as a cashier as light and unskilled. (R. at 526.) He classified her past work as a dishwasher as medium[2] and unskilled. (R. at 526.) Williams classified Wampler's past work as a florist as light and skilled and her work as a waitress as light and semiskilled. (R. at 526.) Williams was asked to consider an individual of Wampler's age, education and work background, who had the residual functional capacity to perform light work that did not require her to work with the public on a regular basis and that allowed her to work alone. (R. at 528.) He stated that floral jobs existed in significant numbers that such an individual could perform, as well as jobs as a cleaner and a laundry worker. (R. at 528-29.) The ALJ asked Williams to consider the same individual who would be limited to performing simple, unskilled tasks. (R. at 529.) Williams stated that there would be jobs available that existed in significant numbers in the national economy, including jobs as a domestic cleaner, a janitor/cleaner, a vehicle and equipment cleaner, a laundry worker and a laundry folder. (R. at 529-30.) Williams stated that all jobs would be precluded should the individual suffer from daily panic attacks and depression that caused her to be absent more than two days per month and that would substantially interfere with her ability to sustain an eight-hour day. (R. at 530.)

In rendering his decision, the ALJ reviewed records from Louis A. Perrott,

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

Ph.D., a state agency psychologist; Joseph I. Leizer, Ph.D., a state agency psychologist; Frontier Health; Dr. Randall E. Pitone, M.D., a psychiatrist; Deborah L. Moore, B.S.; Gordon E. Coburn, A.P.R.N.; Dr. John A. Gergen, M.D.; Dr. Deepti Kudyadi, M.D.; Dr. Paul Augustine, M.D.; Stone Mountain Health Services; and Dr. Bryan T. Arnette, M.D. Wampler's attorney submitted additional records from Dr. Pitone and Frontier Health to the Appeals Council.[3]

The record shows that Wampler received counseling and medication management for symptoms of anxiety and depression from Frontier Health from March 25, 2002, through May 30, 2007.[4] (R. at 150-306, 308-56, 389-447, 476-87.) On July 16, 2002, Wampler admitted that she used alcohol and got into fights when she drank. (R. at 306.) On October 14, 2002, Wampler reported increased depression since the loss of a child when she was five and a half months pregnant. (R. at 302.) On October 31, 2002, Wampler reported that she had started a new job working at a flower store and that she liked her job. (R. at 296.) On February 10, 2003, Wampler reported that she hit her ex-husband in the eye when they got into a fight. (R. at 278.) On March 13, 2003, Wampler reported that she had remarried. (R. at 270, 272.)

On July 14, 2003, Wampler reported to Dr. Randall E. Pitone, M.D., a

_____

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[4]The record shows that Wampler was consistently noncompliant with taking medications as prescribed and keeping her scheduled appointments. (R. at 159, 175, 183, 188, 190, 193-94, 200, 206, 210-11, 218, 222, 231, 236-37, 241-43, 248, 254, 256, 258, 263-64, 269, 300, 304-05, 308-11, 392, 394-96, 399-400, 404, 406, 409-10, 414-16, 422, 424, 427-28, 433, 476, 478, 481.)

psychiatrist, that working in the flower store was "rather boring" and that she had applied to be rehired as a waitress by her previous employer. (R. at 250. ) Dr. Pitone noted that Wampler appeared mildly to moderately anxious and depressed. (R. at 250.) On December 8, 2003, Wampler reported to counselor Deborah L. Moore, B.S., that she was pregnant with her third child. (R. at 235.) Moore assessed Wampler's then-current Global Assessment of Functioning score,[5] ("GAF"), at 55,[6] with her highest GAF score for the previous six months rating at 55 and her lowest GAF score rating at 50.[7] (R. at 333.) On December 12, 2003, Wampler complained of an increased level of anxiety and frequency of panic attacks. (R. at 233.) Dr. Pitone noted that her mood did not show any significant elevation or depression, and her affect was appropriate. (R. at 233.) On December 31, 2003, Wampler told Moore that she had quit her job, stating that her obstetrician[8] had put her on bed rest. (R. at 230.) On August 30, 2004, Wampler complained of weight gain, financial problems and being unable to work because she had to stay at home and care for her newborn baby. (R. at 202.) Dr. Pitone noted that Wampler appeared moderately depressed and mildly anxious, but was otherwise asymptomatic. (R. at 202.)

On January 26, 2005, Wampler reported being "mean, hateful and snappy." (R.

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[8] There is nothing in the record from Wampler's obstetrician.

at 191.) She complained of fatigue, racing thoughts and lack of desire to do things. (R. at 191.) It was reported that Wampler was in her pajamas and that her mood was anxious and depressed. (R. at 191.) On February 11, 2005, Wampler reported that she was feeling better and her medications were helping her symptoms. (R. at 187.) Moore noted that Wampler appeared to be "doing better." (R. at 187.) On May 23, 2005, Wampler reported to Gordon E. Coburn, A.P.R.N., that she had run out of medications four weeks earlier and had not taken any since. (R. at 183-84.) She complained of anxiety and mild depression and stated that she was sleeping fairly well and had a good appetite. (R. at 183.) On July 25, 2005, Wampler complained that her husband might lose his job and that her ex-husband was "causing difficulties regarding custody issues." (R. at 181-82.) Coburn noted only mild anxiety and depression symptoms. (R. at 181.) On August 30, 2005, Wampler complained of increased anxiety, which she attributed to stressors in her life, including a recent move, unemployment and financial difficulties. (R. at 177, 179.) She stated that she wanted to return to work, but that her husband wanted her to stay home to care for the baby. (R. at 179.) On November 14, 2005, Wampler reported that her medications were not working, stating that she needed something stronger than Xanax. (R. at 169.) Coburn reported that Wampler's mood was mildly anxious and depressed. (R. at 169.) On December 5, 2005, Wampler reported that she had an affair with another man, but did not feel guilty about it. (R. at 164.) She blamed her husband for her problems. (R. at 164.) She stated that she was trying to return to work. (R. at 166.) Coburn opined that Wampler tended to "rationalize why she is unable to exercise or utilize other coping mechanisms and attempts to blame this on others such as her husband." (R. at 164.) Coburn noted that Wampler appeared only mildly anxious and depressed. (R. at 164.) That same day, Moore opined that Wampler was relying on medications to solve her

problems instead of taking responsibility for them. (R. at 166.) She explained to Wampler that there was no "magic medication" for all of her symptoms. (R. at 166.)

On January 10, 2006, Wampler complained that she could not find a doctor who would give her pain medication. (R. at 161.) Coburn recommended therapy for Wampler because she relied on medications to solve her issues instead of working out practical solutions. (R. at 161.) Wampler appeared mildly anxious and depressed. (R. at 161.) That same day, Dr. Pitone diagnosed major depressive disorder, dysthymic disorder and anxiety disorder, not otherwise specified. (R. at 161.) He assessed a then-current GAF score of 55. (R. at 161.) Moore also reported that Wampler was having problems with concentration, as she was unable to stay focused and complete sentences. (R. at 163.) On February 28, 2006, Wampler reported that her husband did not want her to get a job, fearing infidelity on her part. (R. at 159.) Coburn noted that Wampler continued "to make changes to her medication regimen without the advice of this clinic." (R. at 159.) He also noted that Wampler continued to refuse suggestions that had been made to her concerning proper sleep hygiene techniques, exercise, proper diet and attending therapy sessions. (R. at 159.) On March 29, 2006, Moore reported that Wampler was solely dependent on medications to cure her anxiety and depression. (R. at 158.) Moore reported that it was her opinion that Wampler was not stable enough to work with the public due to her symptoms. (R. at 158.) Moore reported that Wampler's symptoms could be reduced "if she started working on her problems." (R. at 158.) On May 4, 2006, it was noted that Wampler "sees the benefits of appropriate utilization of diversion/leisure activities as evidenced by her coming to this session from a swimming party with some female friends at one of their homes." (R. at 154.) On May 31, 2006, Dr. Pitone suggested that Wampler

make changes in her daily lifestyle to improve her mood. (R. at 151-52.) On June 21, 2006, Wampler reported that her medications were helping with her symptoms of depression and anxiety. (R. at 446.) She stated that she was attending therapy, but it was not helping due to her not wanting to change. (R. at 446.) She stated that she was "stubborn." (R. at 446.) Wampler stated that she had been going out to play bingo and to the "Fizz." (R. at 446.) She reported that she had recently been arrested for driving under the influence, but denied that she had been drunk. (R. at 446.) On June 28, 2006, Wampler reported that she recently ended a relationship with a man. (R. at 444.) She stated that she visited friends in Kentucky several times each week, and went to the Fizz lounge and to play bingo. (R. at 445.) On July 11, 2006, Wampler reported that she continued to go to Kentucky to play bingo. (R. at 444.) On September 8, 2006, Wampler reported that her lab results failed to show that she suffered from arthritis or fibromyalgia. (R. at 429.) Dr. Pitone reported that Wampler was moderately to severely depressed. (R. at 429.) On September 13, 2006, Moore reported that Wampler's symptoms appeared to be related more to health problems rather than mental illness. (R. at 427.)

On November 1, 2006, Wampler reported that she had been diagnosed with fibromyalgia. (R. at 413.) She reported that swimming pool therapy was recommended, but she stated that she could not participate in therapy because she did not have a swimsuit. (R. at 413.) Moore reported that Wampler had anger issues that needed to be addressed. (R. at 413.) On November 20, 2006, Wampler stated that her primary care physician had recommended swimming therapy, but she stated that she could not find a suitable bathing suit. (R. at 407.) She reported that she broke up with her boyfriend after he allegedly kicked her in the knee in response to her ripping his

shirt while they were wrestling. (R. at 407.) On December 11, 2006, Wampler reported that she had received a reckless driving ticket. (R. at 403.) She stated that she wanted to discontinue Prozac because it caused her to gain weight. (R. at 403.) Moore reported that Wampler was "stubborn about changing her lifestyle" and did not want to change. (R. at 403.) Moore explained to Wampler that she was not going to feel better unless she changed her attitude. (R. at 403.) On December 15, 2006, Wampler reported that she had stopped taking Prozac because it made her gain weight. (R. at 400.) She stated that her husband was moving out of the house and that she was "glad to see him go, but wants his money to stay." (R. at 400.) On December 29, 2006, Wampler reported that she had difficulty controlling her anger. (R. at 397.)

On April 23, 2007, Wampler reported that she was charged with driving under the influence. (R. at 480.) She also stated that she had went to a club with a friend, beat up two girls and went to jail. (R. at 480.) Wampler stated that she felt like she was going "to blow up and kill somebody." (R. at 480.) Moore reported that Wampler's mood was moderately depressed and anxious. (R. at 480.) Moore discussed rehabilitation with Wampler, but Wampler refused to go. (R. at 480.) Moore reported that Wampler's behavior had worsened since the separation of her marriage. (R. at 480.) That same day, Dr. John A. Gergen, M.D., also saw Wampler. (R. at 479.) Dr. Gergen reported that a review of Wampler's chart indicated many questions regarding substance abuse. (R. at 479.) Wampler admitted that she "frequently fakes it" and did not have recall of other events in her life with clarity. (R. at 479.) Dr. Gergen reported that Wampler's past history was highly suggestive of problems not only with mood disturbance, but also attention deficit difficulties. (R. at 479.) Dr. Gergen reported a "working diagnosis" of bipolar spectrum disorder, anxiety disorder,

post-traumatic stress disorder, adult attention deficit disorder and substance abuse by history. (R. at 479.) Dr. Gergen explained to Wampler that she could not continue to consume alcohol while taking Xanax. (R. at 479.)

On March 23, 2007, Dr. Pitone completed a mental assessment indicating that he was unable to assess Wampler's work-related skills. (R. at 470-71.) He reported that Wampler displayed symptoms of depression and anxiety. (R. at 470.) He reported that her mood was moderately to severely depressed and that medication provided little improvement. (R. at 470.) Dr. Pitone reported that Wampler appeared to understand proper medication instructions, but there were incidents when she could not remember if she had taken her medication. (R. at 471.) He reported that Wampler's appearance had decompensated and that there had been incidents during their sessions when her behavior had been inappropriate, labile and impulsive. (R. at 471.)

On February 28, 2006, Louis A. Perrott, Ph.D., a state agency psychologist, indicated that Wampler was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or

peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 116-18.) Perrott reported that Wampler had the ability to perform simple, unskilled work activities in a low-stress, competitive work environment in which she did not have to interact with the general public. (R. at 118.)

Perrott also completed a Psychiatric Review Technique form, ("PRTF"), indicating that Wampler suffered from an affective disorder and an anxiety-related disorder. (R. at 119-32.) He indicated that Wampler had mild limitations in her ability to perform her activities of daily living. (R. at 129.) Perrott indicated that Wampler had moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 129.) He indicated that there was no evidence that Wampler had experienced any episodes of decompensation. (R. at 129.)

On March 24, 2006, Dr. Deepti Kudyadi, M.D., saw Wampler for her complaints of dizziness, body aches and pains. (R. at 364-65.) Dr. Kudyadi reported that Wampler was fully alert and oriented and displayed an appropriate mood and affect. (R. at 364.) Wampler had normal strength throughout, full range of motion and a normal gait. (R. at 364.) Straight leg raising tests were negative. (R. at 365.) Wampler had a few tender points in her upper back. (R. at 365.) Dr. Kudyadi diagnosed benign positional vertigo, generalized arthralgias, generalized anxiety disorder with depression and tobacco abuse. (R. at 365.)

On April 21, 2006, Dr. Paul Augustine, M.D., saw Wampler for complaints of

generalized body aches and joint pains. (R. at 362.) Dr. Augustine reported that Wampler's physical examination was essentially unremarkable. (R. at 362.) He diagnosed arthralgia mainly related to the neck. (R. at 362.)

On May 23, 2006, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a PRTF indicating that Wampler suffered from an affective disorder and an anxiety-related disorder. (R. at 133-46.) He indicated that Wampler had mild limitations in her ability to perform her activities of daily living. (R. at 143.) Leizer indicated that Wampler had moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 143.) He indicated that there was no evidence that Wampler had experienced any episodes of decompensation. (R. at 143.)

Leizer also completed a mental assessment indicating that Wampler was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and to set realistic goals or make plans independently of others. (R. at 147-48.) Leizer reported that Wampler had the ability to perform simple, unskilled work activities in a low-stress, competitive work environment in which she did not

have to interact with the general public. (R. at 149.)

On October 5, 2006, Dr. Bryan T. Arnette, M.D., saw Wampler for complaints of back and neck pain and bloody diarrhea. (R. at 377.) Dr. Arnette reported that Wampler had decreased range of motion of the cervical spine. (R. at 377.) Wampler had tenderness in the thoracic and lumbar spines. (R. at 377.) Straight leg raising tests were positive bilaterally. (R. at 377.) An upper gastrointestinal endoscopy, colonoscopy and ileoscopy were normal. (R. at 387.) Dr. Arnette diagnosed history of abdominal pain with diarrhea and dizziness and low back pain and neck pain. (R. at 377.) On November 22, 2006, Wampler complained of back and neck pain. (R. at 371-72.) She had fairly restricted range of motion of the cervical spine. (R. at 371.) Dr. Arnette noted multiple trigger points throughout Wampler's back and lumbar spine. (R. at 371.) Straight leg raising tests were negative bilaterally. (R. at 371.) Dr. Arnette diagnosed fibromyalgia and chronic diarrhea. (R. at 371.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a),

416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 23, 2007, the ALJ denied Wampler's claims. (R. at 15-26.) The ALJ determined that the medical evidence established that Wampler suffered from severe impairments, namely low back pain, fibromyalgia, major depressive disorder and anxiety, but she found that Wampler did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20-21.) The ALJ found that Wampler had the residual functional capacity to perform a limited range of simple, noncomplex, light work. (R. at 21.) Thus, the ALJ found that Wampler was unable to perform any of her past relevant work. (R. at 24.) Based on Wampler's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Wampler could perform, including those of a laundry worker, a garment folder, a janitor and a vehicle equipment cleaner. (R. at 24-25.) Thus, the ALJ found that

Wampler was not under a disability as defined under the Act and was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Wampler argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-23.) In particular, Wampler argues that the ALJ erred by finding that she had the residual functional capacity to perform light work. (Plaintiff's Brief at 8-15.) Wampler argues that the ALJ offered his own medical opinion concerning her residual functional capacity rather than ordering a consultative examination. (Plaintiff's Brief at 8-15.) Wampler also argues that the ALJ erred in his findings with regard to her mental residual functional capacity. (Plaintiff's Brief at 15-23.) Finally, Wampler argues that this case should be remanded pursuant to sentence four or sentence six based on the additional evidence that was submitted to the Appeals Council. (Plaintiff's Brief at 20-23.)

Wampler argues that the ALJ erred by finding that she had the residual functional capacity to perform light work and contends that the ALJ offered her own medical opinion in reaching this finding. (Plaintiff's Brief at 8-15.) The ALJ found that Wampler had the residual functional capacity to perform a limited range of simple, noncomplex, light work. (R. at 21.) Based on my review of the record, I find that substantial evidence exists to support this finding.

The record shows that in March 2006, Dr. Kudyadi's clinical examination results were unremarkable. (R. at 364-65.) Dr. Kudyadi reported that Wampler was fully alert and oriented and displayed an appropriate mood and affect. (R. at 364.) She had normal strength throughout, full range of motion and a normal gait. (R. at 364.)

Straight leg raising tests were negative. (R. at 365.) Dr. Kudyadi diagnosed benign positional vertigo, generalized arthralgias, generalized anxiety disorder with depression and tobacco abuse. (R. at 365.) In April 2006, Dr. Augustine also reported that Wampler's physical examination was essentially unremarkable. (R. at 362.) Dr. Augustine diagnosed arthralgia. (R. at 362.) In October 2006 and November 2006, Dr. Arnette found Wampler to be in no apparent distress. (R. at 371, 377.) She had normal strength throughout and a normal gait. (R. at 371, 377.) Wampler's cervical spine range of motion was "fairly restricted" on flexion and extension, but her lumbar spine range of motion was "fairly normal." (R. at 371.) Dr. Arnette noted an assessment of fibromyalgia based on his observation that "Dr. Shalaby"[9] had diagnosed fibromyalgia and Wampler's subjective complaints. (R. at 371.) None of Wampler's treating physicians placed any limitations on her work-related abilities.

With regard to Wampler's mental residual functional capacity, the ALJ found that Wampler could work in an environment which required little contact with co-workers and only occasional interaction with supervisors. (R. at 21.) The ALJ also found that Wampler had a moderate reduction in concentration and, therefore, would be limited to performing simple, noncomplex tasks. (R. at 21.)

Treatment notes from Frontier Health illustrate that Wampler's complaints are primarily related to life choices, including marriage problems, infidelity, unemployment, child custody issues, financial difficulties, habitual drinking, reckless and drunken driving and fighting. (R. at 151, 155, 158-59, 164, 166, 169, 177, 181, 187, 202, 250, 278, 292, 296, 302, 306, 389-90, 398, 400, 403, 407, 413, 444, 446,

---

[9]The record does not contain records from Dr. Shalaby.

480, 482.)

Treatment notes from Dr. Pitone were consistently unremarkable. He assessed Wampler to be alert, oriented, calm and cooperative. She made good eye contact, established rapport, communicated effectively and provided adequate information. (R. at 161, 169, 177, 181, 188, 194, 202, 208, 233, 244, 250, 258, 401, 420, 429, 440.) Other than noting that Wampler appeared to be mildly to moderately depressed and anxious, she was not despondent, and her affect was generally appropriate and unrestricted. Psychomotor activity was normal, with no evidence of psychosis, cognitive impairment or dangerousness to herself or others. (R. at 161, 169, 177, 181, 188, 194, 202, 208, 233, 244, 250, 258, 401, 420, 429, 440-41.) The state agency psychologists found that Wampler could perform simple, unskilled work in a low-stress, competitive work environment in which she did not have to interact with the general public. (R. at 118, 149.) In August 2005, Wampler reported that she wanted to return to work, but that her husband wanted her to stay home to care for the baby. (R. at 179.) In February 2006, she reported that her husband did not want her to get a job, fearing infidelity on her part. (R. at 159.) She stated that she and her husband had applied for disability benefits because they could not live on the small workers' compensation benefit check her husband received. (R. at 442.)

The record shows that while Wampler understands that she needs to take responsibility for making the necessary changes in her life, she persistently resists repeated attempts by her health care providers to help her, blames others for her problems and refuses to do what she needs to do to change her life. (R. at 151-52, 159, 164, 403, 446.) Moreover, the record is replete with instances of Wampler's noncompliance with medication regimens and treatment recommendations. (R. at

-18-

159, 175, 183, 188, 190, 193-94, 200, 206, 210-11, 218, 222, 231, 236-37, 241-43, 248, 254, 256, 258, 263-64, 269, 300, 304-05, 308-11, 392, 394-96, 399-400, 404, 406, 409-10, 414-16, 422, 424, 427-28, 433, 476, 478, 481.) For instance, the mental health care providers at Frontier Health opined that Wampler relied on medications to solve her issues instead of working out practical solutions. (R. at 158, 161, 166.) It also was noted that Wampler made "changes to her medication regimen without the advice of this clinic." (R. at 159.) Wampler continued to refuse suggestions made to her concerning proper sleep hygiene techniques, exercise, proper diet and attending therapy sessions. (R. at 159.) Counselor Moore reported that, if Wampler would make healthy lifestyle changes, her symptoms could be reduced. (R. at 158.) It was noted that Wampler "sees the benefits of appropriate utilization of diversion/leisure activities as evidenced by her coming to this session from a swimming party with some female friends at one of their homes." (R. at 154.) Moore reported that Wampler was "stubborn about changing her lifestyle" and did not want to change. (R. at 403.) She reported that Wampler was not going to feel better unless she changed her attitude. (R. at 403.)

Pursuant to 20 C.F.R. §§ 404.1530, 416.930, if a claimant's ability to work can be restored through treatment, then such prescribed treatment must be followed unless the claimant has a good reason for failing to follow such treatment. Wampler has been noncompliant with recommended treatment on multiple occasions without good reason. In addition, when Wampler took her medication as prescribed, she reported feeling better. (R. at 187, 446.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

In addition, the record indicates that Wampler maintains an active and vigorous life. (R. at 65-67, 81-88.) She helps care for her sister's children. (R. at 245, 253.) She does all the household chores. (R. at 67, 83, 107-08.) Wampler drives a car, shops and handles her own finances. (R. at 68, 84, 108.) Wampler aggressively pursued and participated in relationships with other men during both of her marriages. (R. at 155, 164, 166, 302, 390, 407, 413, 482.) She regularly goes to nightclubs and to play bingo. (R. at 390, 446, 482.) She has received multiple citations for reckless or drunken driving. (R. at 403, 444, 446, 482.)

Finally, it is important to note that no treating source placed any limitations on Wampler's work-related mental activities. Wampler's activities of daily living also support the ALJ's mental residual functional capacity finding. Finally, the ALJ gave Wampler's testimony regarding her difficulty working around others the benefit of the doubt by incorporating it into her residual functional capacity finding.

Wampler also argues that the Appeals Council erred by failing to consider new and material evidence. A review of the record does not support this argument. In fact, the Appeals Council's decision on its face shows that it did consider this additional evidence. Nonetheless, the Appeals Council found that the additional records did not show any additional limitations not addressed by the ALJ, and, therefore, provided no basis for changing the ALJ's decision. (R. at 5-8.) Based on my finding that substantial evidence supports the Commissioner's finding as to Wampler's mental residual functional capacity, I agree.

For all of the above-stated reasons, I find that substantial evidence exists to support the ALJ's finding that Wampler was not disabled.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists to support the Commissioner's finding that Wampler had the residual functional capacity to perform a limited range of light work; and

2.    Substantial evidence exists to support the Commissioner's finding that Wampler was not disabled under the Act and was not entitled to DIB or SSI benefits.

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wampler's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits during the relevant time period.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of

court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 14, 2010.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE